IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Bankr. Case No. 16-11501-CSS |
| MAXUS ENERGY CORPORATION, *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | |
| MAXUS LIQUIDATING TRUST, | : | Adv. Proc. No. 18-50489-CSS |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| YPF S.A., YPF INTERNATIONAL S.A., YPF | : | |
| HOLDINGS, INC., CLH HOLDINGS, INC., | : | Misc. No. 19-51-RGA |
| REPSOL, S.A., REPSOL EXPLORACION, S.A., | : | Misc. No. 19-52-RGA |
| REPSOL USA HOLDINGS CORP., REPSOL | : | (Consolidated) |
| E&P USA, INC., REPSOL OFFSHORE E&P | : | |
| USA, INC., REPSOL E&P T&T LIMITED, and | : | |
| REPSOL SERVICES CO., | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM**

Brian E. Farnan, Esq., Michael J. Farnan, Esq., Farnan LLP, Wilmington, DE, attorneys for plaintiff Maxus Liquidating Trust.

Adam G. Landis, Esq., Matthew B. McGuire, Esq., Landis Rath & Cobb LLP, Wilmington, DE, attorneys for YPF Defendants.

Robert J. Denhey, Esq., Curtis S. Miller, Esq., Daniel B. Butz, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Edward Soto, Esq., Weil, Gotshal & Manges LLP, Miami, FL; and Robert Lemmons, Esq., Weil Gotshal & Manges LLP, New York, NY, attorneys for Repsol Defendants.

September 11, 2019

ANDREWS, UNITED STATES DISTRICT JUDGE:

Pending before the Court are two motions for leave to file interlocutory appeal from a February 15, 2019 Bankruptcy Court order (Adv. D.I. 108)[1] ("Interlocutory Order") filed by the YPF Defendants (Misc. No. 19-51-RGA, D.I. 1) ("YPF Mot.") and the Repsol Defendants (Misc. No. 19-52-RGA, D.I. 1) ("Repsol Mot.," and, together with the YPF Mot., "Motions for Leave"). The Interlocutory Order denied motions to dismiss the complaint (Adv. D.I. 1) in the above-captioned adversary proceeding ("Adversary Proceeding") (Adv. D.I. 50, 57) ("Motions to Dismiss") filed by both the YPF Defendants and the Repsol Defendants for the reasons set forth in the Bankruptcy Court's accompanying letter opinion (Adv. D.I. 107) ("Opinion" or "Op."). Plaintiff Maxus Liquidating Trust ("Trust") has filed its opposition, and the Motions for Leave are fully briefed. (D.I. 7, 8, 9).[4] For the reasons set forth below, the Court will deny the Motions for Leave.

I.  BACKGROUND

   A.  Parties

The dispute framed by the Complaint centers on a series of environmental contaminations that have occurred over several decades at various sites of the Debtors' business operations, the most significant being the Diamond Alkali site located on the Passaic River in New Jersey. Debtor Maxus is a successor to Diamond Alkali Company and its parent Diamond Shamrock Corporation. These companies and various successors operated a number of industrial sites

---

[1] The docket of the Adversary Proceeding, *Maxus Liquidating Trust v. YPF S.A., et al.,* Adv. No. 18-50489-CSS (Bankr. D. Del.), is cited herein as "Adv. D.I. __." The Chapter 11 docket, *In re Maxus Energy Corp., et al.,* No. 16-11501-CSS (Bankr. D. Del.), is cited herein as "B.D.I. __." The docket of a related adversary proceeding discussed herein, *New Jersey Department of Environmental Protection v. Occidental Chemical Corp., et al.,* Adv. No. 16-510250-CSS (Bankr. D. Del.) is cited "OCC Adv. D.I. __."
[4] On March 14, 2019, the Court entered an order consolidating Misc. No. 19-51-RGA with Misc. No. 19-52-RGA and directing all future filings to be filed only in Misc. No. 19-51-RGA. (*See* Misc. No. 19-51-RGA, D.I. 4). The consolidated docket is cited herein as "D.I. __."

throughout the U.S. In 1986, an affiliate of Occidental Chemical Corporation purchased Diamond Shamrock's chemicals business through a stock purchase, and the affiliate thereafter merged into Occidental. Importantly, Diamond Shamrock, which was renamed Maxus in 1987, agreed to indemnify Occidental from and against certain environmental liabilities. (Compl. ¶¶ 41, 44-45). In 1995, YPF, parent of YPF Holdings, utilized a leveraged buyout in order to obtain control of Maxus through acquisition of its common stock. Following the leveraged buyout, a significant amount of Maxus' foreign assets were transferred to YPF. In 1996 and 1997, Maxus sold foreign subsidiaries to YPFI, a foreign subsidiary of YPF. (Compl. ¶¶ 59, 86, 90, 93). In 1999, Repsol acquired a majority ownership of YPF, thereby granting Repsol an indirect ownership interest in Maxus. Repsol was YPF's controlling shareholder from 1999 to 2012. Repsol allegedly caused Maxus to sell assets to third parties in 1999 and 2000 and caused the sale of former Maxus subsidiaries to Repsol affiliates and third parties in 2001 and 2002. During Repsol's ownership of YPF, certain Debtors entered into settlement agreements amongst themselves and with Repsol in 2007 and 2009, and with YPF in 2008. (Compl. ¶¶ 110, 114, 119-121, 139-140, 148). Upon expropriation of Repsol's interest by the Argentine government in 2012, both the ownership relationship between Repsol and YPF and Repsol's indirect affiliation with Maxus were severed. (Compl. ¶¶ 188-191).

      B.    **New Jersey Litigation**

In 2005, the State of New Jersey Department of Environmental Protection ("State") sued Maxus, Repsol, and Occidental for environmental clean-up costs resulting from damage and pollution of the Passaic River ("New Jersey Litigation"). In May of 2008, Occidental filed cross-claims against Maxus for various causes of action including breach of contract, and against YPF and Repsol directly and derivatively for causes of action including alter ego, fraudulent transfers, unjust enrichment, and civil conspiracy. In December 2013, the State settled with the

3

non-Occidental Defendants. Pursuant to the settlement, "all claims that the State had asserted against Repsol, YPF, YPF International, YPF Holdings, CLH Holdings, Maxus, Tierra, and Maxus International were dismissed in exchange for a $130 million payment to the State." (Occidental Adv. D.I. 28 at ¶ 39). Additionally, the settlement provided for certain claims against Occidental to be released by the State. (*Id.*) In December 2014, the State released all remaining claims against Occidental pursuant to a consent judgment in exchange for a payment of $190 million. (*Id.* at ¶ 40).

While the claims brought by the State were resolved by these settlements, the parties cross-claims continued on in the New Jersey Court. After ruling on various motions to dismiss and summary judgment, the New Jersey Court ordered a trial of Occidental's claims that YPF was the alter ego of one or more Debtor entities.[6] The trial was set to begin on Monday, June 20, 2016.

### C. The Bankruptcy

On the evening of June 17, 2016 ("Petition Date"), Debtors filed their petitions under Chapter 11 of the Bankruptcy Code. Creditors in the bankruptcy proceedings filed proofs of claim asserting that the Debtors had caused in excess of $13 billion in environmental damages as a result of their and their predecessors' toxic discharges, and Occidental is the Debtors' largest unsecured creditor. (B.D.I. 2, ¶ 20). The Chapter 11 petitions stayed the New Jersey Litigation indefinitely. Following the Petition Date, Occidental immediately removed the New Jersey Litigation to the Bankruptcy Court.[7] On July 20, 2016, Repsol moved to have the Bankruptcy

---

[6] The New Jersey Court granted summary judgment in Repsol's favor and dismissed cross-claims that Occidental brought against Repsol seeking to hold it liable, along with YPF, as an alter ego of Maxus. Dismissal was on the specific ground that Occidental did not establish the need to pierce the veil separating YPF from Repsol, given that YPF had the wherewithal to pay Occidental's claim. (Adv. D.I. 34, Ex. U, at 10). That ruling is on appeal.
[7] On June 20, 2016, Occidental commenced an adversary proceeding by removing the New Jersey Litigation to the United States Bankruptcy Court for the District of New Jersey.

4

Court remand back to New Jersey all of their claims involving Occidental, including any claims related to Repsol's alter ego conduct. (Occidental Adv. D.I. 27, 28). YPF opposed remand, taking the position that any and all claims seeking alter ego recoveries against the Debtors' prepetition shareholders now belonged to the Debtors, not Occidental, by virtue of the bankruptcy petitions: "The Remand Motion mischaracterizes the [removed] Claims and disregards the Debtors' exclusive jurisdiction over these and all other pre-petition, general claims originating out of the [New Jersey Litigation]." (Occidental Adv. D.I. 33, ¶ 1 (opposing Repsol's motion for remand)). YPF argued that, post-petition, "creditors [like Occidental] lack standing to assert claims that are 'property of the estate,'" and that "if a claim is a general one, with no particularized injury arising from it, that may be asserted by any creditor, only a debtor's estate may bring it." (*Id.* at ¶ 2). On November 15, 2016, the Bankruptcy Court issued its opinion agreeing with YFP and holding that "the Occidental [alter-ego] Claims are, in fact, property of the bankruptcy estate and the proper party to bring them is the Debtors." *In re Maxus Energy Corp.*, 560 B.R. 111, 114 (Bankr. D. Del. 2016) ("Abstention Opinion").

Occidental sought reconsideration, arguing that it retained co-extensive authority to pursue its own alter ego claims against both YPF and Repsol. The Bankruptcy Court disagreed and denied reconsideration in a decision and order dated August 2, 2017. In that order, the Bankruptcy Court found that, "notwithstanding the individualized nature of the injury or cause of action, to the extent the other creditors ***and the debtor*** could pursue claims based upon the same theory, the claim in question should be considered general, and, therefore, property of the estate." *In re Maxus Energy Corp.*, 571 B.R. 650, 657 (Bankr. D. Del. 2017) ("Clarification Opinion") (emphasis in original) (citing *Emoral Inc. v. Diacetyl (In re Emoral, Inc.)*, 740 F.3d

---

Occidental then moved in the New Jersey Bankruptcy Court to transfer the venue of the New Jersey Litigation to the United States Bankruptcy Court for the District of Delaware. On June 28, 2016, the New Jersey Bankruptcy Court granted Occidental's motion.

875 (3d Cir. 2014)). No party appealed the Bankruptcy Court's determinations. The Trust argues that these determinations established a "bright line law of the case" that "even if the Debtors' prepetition creditors such as Occidental may have had trial-ready prepetition alter ego claims, the Debtors were the only parties who could assert such claims for the benefit of all creditors." (D.I. 7 at 6).

The Debtors proposed a plan of liquidation anchored in prosecuting claims against Defendants. (Compl. ¶¶ 206, 211). The Plan was structured to provide that the Trust would bring a consolidated action, with any litigation recoveries to be distributed pursuant to a heavily negotiated plan waterfall. (D.I. 7 at 7). The Debtors' proposed plan was confirmed on May 22, 2017 (B.D.I. 1460) ("Plan"). The Plan established the Trust and provided for the transfer of all causes of action held by the Debtors and their estates against any of the YPF entities to the Trust. (Plan, § I.A.217). No party appealed the order confirming the Plan.

### D.  Adversary Proceeding

On June 14, 2018, the Trust filed the 130-page Complaint commencing the Adversary Proceeding. The Complaint generally alleges a three-part strategy developed and implemented by Defendants in the late 1990s and early 2000s to strip the Debtors of any meaningful assets that could have been used to satisfy their environmental obligations and to transfer those assets out of the U.S. The Complaint alleges that the Defendants used their corporate control over the Debtors to ensure that those entities did not precipitate any event that would reveal the environmental funding deficit, including through "drip-feed[ing]" the Debtors with barely enough capital to meet their quarterly expenses. (Compl. at ¶ 12). The Complaint further alleges that, once the statutes of limitations had presumably passed on potential claims against them, Defendants intended to cleanse their liability exposure in a U.S. bankruptcy proceeding over the objection of all of the Debtors' environmental creditors. (*Id.* at ¶¶ 170, 227). Count I of the

Complaint is a claim for alter ego liability, in which the Trust seeks to hold Defendants jointly and severally liable (up to $14 billion) for all of the allowed proofs of claim filed by creditors against the Debtors. Counts II through XXI seek to avoid alleged fraudulent transfers that occurred between 1996 and 1997 (prior to Repsol's acquisition of YPF) and separate transfers that occurred between 1999 to 2009 (during the period in which Repsol had a controlling interest in YPF). Finally, the Trust asserts claims for unjust enrichment (Count XXII) and civil conspiracy (Count XXIII).

On October 12, 2018, Defendants filed motions to dismiss the Complaint in its entirety, arguing that the Trust had not pleaded a single viable cause of action against them. Following briefing, on January 22, 2019, the Bankruptcy Court heard oral argument. (Adv. D.I. 100). On February 15, 2019, the Bankruptcy Court issued the Opinion and Interlocutory Order which Defendants now seek leave to appeal. The Bankruptcy Court determined that, consistent with its prior determinations, (1) the Trust could bring a single, consolidated claim against YPF and Repsol for alter ego conduct including asset stripping, adverse domination, and failure to follow corporate formalities, and that (2) the Trust could recover, among other damages, the damages Occidental had been seeking in the New Jersey Litigation. (Op. at 3, 6-9). The Bankruptcy Court also ruled that, with respect to the alleged transfers of all of the Debtors' assets in the first step of the alleged strategy, the Complaint (1) states viable fraudulent conveyance claims, and (2) provided factual allegations that can warrant a determination that the relevant statutes of limitations on those claims did not begin to run until the last act of Defendants' coordinated strategy – the planned filing of a bankruptcy proceeding. (*Id.* at 9-10).

By the Motions for Leave, Defendants request that this Court consider their appeal on an interlocutory basis and reverse and/or remand the Interlocutory Order.

II.     **JURISDICTION AND STANDARD OF REVIEW**

This Court has jurisdiction to hear appeals "with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(3). Section 158(a) does not identify the standard district courts should use in deciding whether to grant such an interlocutory appeal. *See id.* "Typically, however, district courts follow the standards set forth under 28 U.S.C. § 1292(b), which govern interlocutory appeals from a district court to a court of appeals." *In re AE Liquidation, Inc.*, 451 B.R. 343, 346 (D. Del. 2011).

Under the standards of § 1292(b), an interlocutory appeal is permitted only when the order at issue (1) involves a controlling question of law upon which there is (2) substantial ground for difference of opinion as to its correctness, and (3) if appealed immediately, may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974). Entertaining review of an interlocutory order under § 1292(b) is appropriate only when the party seeking leave to appeal "establishes exceptional circumstances [to] justify a departure from the basic policy of postponing review until after the entry of final judgment." *In re Del. & Hudson Ry. Co.*, 96 B.R. 469, 472-73 (D. Del. 1989), *aff'd*, 884 F.2d 1383 (3d Cir. 1989). In part, this stems from the fact that "[p]iecemeal litigation is generally disfavored by the Third Circuit." *In re SemCrude, L.P.*, 2010 WL 4537921, at *2 (D. Del. Oct. 26, 2010) (citing *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)). Further, leave for interlocutory appeal may be denied for "entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue." *Katz*, 496 F.2d at 754.

### III. DISCUSSION

YPF asserts that its appeal of the Interlocutory Order involves two questions of law as to which substantial ground for difference of opinion exists:

> Issue 1: Whether the Bankruptcy Court erred by holding that (i) alter ego is an independent cause of action under Delaware law, and that (ii) such claim can be pursued by the Trust as a separate cause of action to recover the Debtor's creditors' claims;
>
> Issue 2: Whether the Bankruptcy Court erred by "expand[ing] the statute of limitations" from 2006 to the Petition Date for the Trust's (i) fraudulent transfer claims for transfers that were publicly disclosed in the SEC filings and that "occurred outside the operable statute of limitations," and (ii) untimely unjust enrichment and civil conspiracy claims.

(YPF Mot. at 6). Similarly, Repsol submits that review of the following questions of law:

> Issue 1: Whether the Bankruptcy Court erred in permitting the Trust to pursue a standalone, independent cause of action for alter ego.
>
> Issue 2: Whether the Bankruptcy Court erred by holding that the collapsing doctrine, as set forth in *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 271 (Bankr. S.D.N.Y. 2013), could sweep Repsol into an alleged scheme in which Repsol was not present for the scheme's alleged genesis or its alleged completion, and where there were no allegations regarding the interconnectedness of the intermediate transactions that spanned a period of twenty years.

(Repsol Mot. at 5). Thus, Defendants each seek leave to raise on appeal alleged errors in the alter ego and statute of limitations rulings. The Court will address each in turn.

### A. Controlling Question of Law as to Which There Is Substantial Ground for Difference of Opinion

A controlling question of law is one that (1) "would be reversible error on final appeal" or (2) is "serious to the conduct of the litigation, either practically or legally." *Katz*, 496 at 755. "[O]n the practical level, saving of time of the district court and of expense to the litigants [has been] deemed . . . to be a highly relevant factor." *Id.* (internal citation omitted). The "controlling question of law" also must be one as to which there is "substantial ground for difference of opinion." 28 U.S.C. § 1292(b). This calls for more than mere disagreement with the ruling of the bankruptcy court. To satisfy this standard, "the difference of opinion must arise out of genuine doubt as to the correct legal standard." *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 208 (D.N.J. 1996), *aff'd,* 141 F.3d 1154 (3d Cir. 1998); *see also In re Physiotherapy Holdings, Inc.*, 2017 WL 6524524, at *6 (D. Del. Dec. 21, 2017) (same). Conflicting and

contradictory opinions can provide substantial grounds for a difference of opinion. *White v. Nix*, 43 F.3d 374, 378 (8th Cir. 1994). Additionally, the absence of controlling law on a particular issue can constitute substantial grounds. *Chase v. Manhattan Bank v. Iridium Africa Corp.*, 324 F. Supp. 2d 540, 545 (D. Del. 2004). This factor is also met when "the bankruptcy court's decision is contrary to well-established law." *In re Marvel Entm't Grp., Inc.*, 209 B.R. 832, 837 (D. Del. 1997).

### 1. Alter Ego Claim

Defendants argue that the Opinion incorrectly held that "alter ego can constitute an independent claim." (YPF Mot. at 9-10). Defendants argue that this is a controlling issue of law because it would be reversible error on final appeal and also because it is contrary to well-established law. Repsol argues that numerous cases hold that alter ego is a remedy, not a substantive cause of action (Repsol Mot. at 8-11) and points out several cases that colloquially use the phrase "alter ego claims." (*Id.* at 11-12). Repsol argues that the Bankruptcy Court adopted this latter group of cases and allowed "[j]argon and shorthand" to "substantively transform the law into creating independent alter ego claims." (*Id.* at 11). Defendants argue that this Court should pass on this issue before Defendants are forced to expend any resources on discovery.

The Trust argues that Defendants have selectively quoted the Opinion in order to present an unfair reading of its holding, as the Bankruptcy Court actually stated that it "disagrees that piercing the corporate veil or asserting a claim for alter ego is only a remedy and not an independent cause of action. When coupled with allegations of another wrong, such as breach of fiduciary duty or a fraudulent conveyance, alter ego can constitute an independent claim." (Op. at 3). The Opinion framed the question as whether the bankruptcy estate can designate, as the Trust did here, an overarching claim of "alter ego" to remedy a host of improper alter ego

10

conduct by a parent corporation, including asset stripping, that leaves a debtor without sufficient capital to pay its creditors. The Opinion further clarified that, consistent with the law of the case, the Trust could "collectively" recover damages on behalf of all creditors, including amounts equal to the unpaid creditors' claims. As the Bankruptcy Court noted, "it would be inequitable to have a collective proceeding and not to allow the creditors to proceed collectively." (*Id.*) The Trust further asserts that the Opinion did not rely on cases that colloquially used the phrase "alter ego claims" and did not use the phrase colloquially itself. Rather, the Opinion clearly insists that the alter ego requires "allegations of another wrong, such as a breach of fiduciary duty or a fraudulent conveyance." (Op. at 3).

The Court agrees with the Trust that the extraordinary relief of interlocutory appeal is not required to correct any terminological imprecision that may exist in the Opinion, which is not a controlling question of law that the Court needs to address at this time.

### 2. Trust's Ability to Proceed in Collective Action

Defendants further dispute that the Trust is the proper plaintiff in a collective action seeking to impose alter ego liability on YPF and Repsol. YPF attacks the proposition that YPF and Repsol can ever be held liable as the Debtors' alter egos in a collective action. YPF contends that the Trust's ability to proceed collectively on behalf of the Debtors and all of their creditors is foreclosed by *Caplin v. Marine Midland Grace Tr. Co.*, 406 U.S. 416 (1972), which generally bars trustees from prosecuting individual claims of creditors. Conversely, the Trust argues that YPF is wrong and should be judicially estopped from taking this position based on its prior arguments.

The Court finds no genuine disagreement as to the correct legal standard here. The Trust is not the successor to the individual claims of creditors, as the Bankruptcy Court recognized in the Abstention and Clarification Opinions. Rather, these prior decisions "required Maxus's

11

creditors to defer to the Debtor" with respect to the pursuit of their claims seeking to impose the Debtors' debts on YPF or Repsol. (Op. at 3). This is consistent with Third Circuit's decision in *Emoral*, which held that, if a claim against a shareholder is "a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Emoral*, 740 F.3d at 883. At issue in the Abstention and Clarification Opinions were Occidental's asserted individual claims for Maxus's breach of its contractual indemnity obligations to Occidental, which Occidental interposed derivatively against YPF and Repsol as alleged alter egos. (Abstention Op. at 115). Occidental's claims, however, alleged general alter ego conduct that harmed not only Occidental but the Debtors and the Debtors' other creditors. (*Id.* at 15). Accordingly, the "generalized harm" entailed by the alleged alter ego conduct made Occidental's claims an estate claim under existing Third Circuit precedent. (*Id.* at 12).

Moreover, the Trust argues, a collective proceeding is the very result that YPF advocated for in order to forestall Occidental's trial in the New Jersey Litigation. YPF asserted that the Debtors owned the claims that YPF sought to settle, not Occidental. (Occidental Adv. D.I. 33, ¶ 2 (opposing Repsol's remand motion and arguing that, post-petition, "creditors [like Occidental] lack standing to assert claims that are 'property of the estate,'" and that "if a claim is a general one, with no particularized injury arising from it, that may be asserted by any creditor, only a debtor's estate may bring it.")). YPF now seeks to argue that having one debtor seek to recover for the generalized harms runs afoul of *Caplin*'s holding that a trustee does not have standing to sue on behalf of individual creditors. The Trust argues that YPF should be judicially estopped from taking that position, having previously prevailed on its prior, contrary arguments before the Bankruptcy Court. (*See* D.I. 7 at 14; *see also In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010)

12

("[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."); *In re Armstrong World Indus.*, 432 F.3d 507, 517 (3d Cir. 2005) (judicial estoppel "protect[s] the judicial process by preventing parties from deliberately changing positions according to the exigencies of the moment") (internal quotations omitted).

This issue is not appropriate for interlocutory review. First, the cases cited by Defendants are distinguishable or inapposite. The sole issue in *Caplin* was whether a bankruptcy trustee had standing to assert, on behalf of holders of debentures issued by the debtor, claims of misconduct by the indenture trustee. *Caplin*, 406 U.S. at 416. Unlike this case, the Court in *Caplin* held that the claim against the indenture trustee was property of the debenture holders, not of the estate, and thus was not subject to the trustee's mandate to collect and reduce to money the property of the estate. *Caplin* did not involve allegations that the indenture trustee was an alter ego of the Debtors. *Id.* at 434. Similarly, Defendants' reliance on *Marion* is misplaced. *Marion v. TDI, Inc.*, 591 F.3d 137 (3d Cir. 2010). The Court in *Marion* determined that a receiver had standing to bring claims against insiders based on their role in a Ponzi scheme that harmed a corporation through which the scheme was run. The *Marion* Court noted, "A receiver no doubt has standing to bring a suit on behalf of the debtor corporation against third parties who allegedly helped that corporation's management harm the corporation," and the receiver's "theory of injury finds support in the law of our Court." *Id.* at 148-49. These cases do not establish substantial ground for a difference of opinion that would justify interlocutory appeal. The judicial estoppel issue further supports the Court's decision that this issue is not appropriate for interlocutory review.

3.   **Statute of Limitations Issue**

Defendants argue that the Bankruptcy Court created new law on state statutes of limitations as they apply to fraudulent conveyance claims. Defendants contend that the

13

Bankruptcy Court erred when it determined that, based on the facts alleged in the Complaint, the Trust could potentially "expand the applicable 4-year statute of limitations for separate and distinct transfers that occurred from 1996 to 2009 all the way to the 2016 Petition Date to make it a 20-year statute of limitations when not a single factor considered by courts in the Third Circuit … is applicable here." (YPF Mot. at 13). Defendants argue that the Bankruptcy Court incorrectly reached its result by "collaps[ing] various transactions that occurred over two decades for the purpose of allowing the Trust to avoid the application UFTA statute of limitations period." (Repsol Mot. at 13). Defendants each label the ruling as "unprecedented." (YPF Mot. at 14-15; Repsol Mot. at 15).

To be appropriate for interlocutory appeal, the difference of opinion must arise out of genuine doubt as to the correct legal standard. In determining not to dismiss the bulk of the fraudulent conveyances that form the basis of the Complaint, the Bankruptcy Court determined that the Trust had alleged facts sufficient to support a plausible theory that would expand the statute of limitations under the *Tronox* collapsing doctrine. (Op. at 9-10 (citing *Tronox*, 503 B.R. at 268 (examining fraudulent transfers "for their substance, not their form," and holding that "[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications."))). In *Tronox*, the bankruptcy court determined, at the trial stage, that it was appropriate to collapse the transactions and apply the statute of limitations from the last act.

Here, the Complaint presented particularized allegations and evidence that the transfers at issue were part of a coordinated strategy to insulate the transfers from judicial review by intentionally running out the limitations clock with alter ego control over the Debtors through the Petition Date. The cases cited by Defendants do not hold that the collapsing doctrine cannot be used for purposes of starting the clock for statute of limitations purposes. As the Trust correctly points out, when to start the limitations clock on a fraudulent conveyance claim is a fact-

intensive inquiry that is typically decided at the summary judgment or trial stage. *See, e.g., Tronox*, 503 B.R. at 270 (collapsing transactions from the last act at the trial stage); *In re Nat'l Forge Co.*, 344 B.R. 340, 343 (W.D. Pa. 2006) (collapsing the transactions at the summary judgment stage); *In re Fundamental Long Term Care, Inc.,* 507 B.R. 359, 383-84 (Bankr. M.D. Fla. 2014) (after motion to dismiss stage, with proper proof, court would collapse the transactions, such that fraudulent transfer claims would be timely). Here, the Bankruptcy Court determined that the facts alleged in the Complaint supported a plausible theory that would expand the statute of limitations under *Tronox*. (Op. at 9-10). Defendants disagree not with the legal standard but with its application to the allegations in this Complaint. Fact-intensive inquiry is not appropriate for interlocutory appeal.

In support of their argument that the appeal presents a controlling question of law, Defendants cite the factors that courts in the Third Circuit have analyzed when determining whether to collapse multiple transactions into a single "transfer": (i) whether all of the parties involved had knowledge of multiple transactions; (ii) whether each transaction would have occurred on its own; and (iii) whether each transaction was dependent or conditioned on other transactions. (*See* YPF Mot. at 13; Repsol Mot. at 12-13). YPF argues that none of these factors can apply to it because it could never have foreseen that Repsol would acquire YPF in 1999. (YPF Mot. at 13). Repsol makes the converse argument that collapsing cannot apply to it because "Repsol was not involved in either the creation or completion of the alleged 'single integrated scheme.'" (Repsol Mot. at 15).

The Court agrees with the Trust that these arguments further demonstrate that the purported controlling questions of law are really questions of fact that can only be resolved by the Bankruptcy Court after a proper evidentiary record is laid. *See Katz*, 496 F.2d at 754 (leave for interlocutory appeal may be denied for "entirely unrelated reasons such as ... the desire to

have a full record before considering the disputed legal issue."); *Turner v. Frascella Enters. (In re Frascella Enters.)*, 388 B.R. 619, 623-24 (Bankr. E.D. Pa. 2008) ("It is without question that issues of fact are not an appropriate basis for an interlocutory appeal.") As such, the Bankruptcy Court's statute of limitations ruling does not meet the criteria for interlocutory review.

### B. Whether Immediate Appeal Will Materially Advance Termination of Litigation

Even assuming any of these issues met the "controlling question of law" standard, leave to appeal still must be denied as the issues identified by Defendants do not meet the other criteria of § 1292(b). Defendants argue that reversal by this Court would result in the dismissal of all, or virtually all, of the Trust's claims. (YPF Mot. at 8). The Trust argues that granting leave to appeal will not obviate the underlying litigation because the Trust has unchallenged claims against Defendants that will continue regardless of an immediate appeal.

The Court agrees with the Trust. Even if Defendants obtained a reversal of the portions of the Opinion they have identified, the remaining litigation will continue on in substantially the same form, as the Trust's claims for unjust enrichment, civil conspiracy, and the associated veil piercing claim would remain. While Defendants do challenge the unjust enrichment claim on statute of limitations grounds, reversal of the Bankruptcy Court's *Tronox*-based holding would not be dispositive, as "unusual or extraordinary circumstances [may] warrant deviating from the analogous limitations period" for unjust enrichment claims. *Pulieri v. Boardwalk Props., LLC*, No. 9886-CB, 2015 Del. Ch. LEXIS 37, at *38 (Del. Ch. Feb. 18, 2015). Defendants do not challenge that the Complaint sets forth adequate factual allegations to support those claims, as those claims have not been challenged in the Motions for Leave or in motion to dismiss filed in the Adversary Proceeding. Discovery on these remaining claims likely will be substantially similar in scope to the discovery on the alter ego and fraudulent conveyance claims. An interlocutory appeal should not be allowed if it "will not advance the overall progress of the

[adversary] action, which consists of [additional] claims" unaffected by the appeal. *In re Greenfield Energy*, 2017 WL 6524525, at *6 (D. Del. Dec. 21, 2017). Under these circumstances, an immediate appeal of one or all of these issues "would only promote piecemeal determination of the questions raised in the adversary action and would likely create unnecessary delay." *AE Liquidation*, 451 B.R. at 348.

### C. Whether Exceptional Circumstances Justify Immediate Appeal

Because an interlocutory appeal represents a deviation from the basic judicial policy of deferring review until after the entry of final judgment, the party seeking leave to appeal an interlocutory order must also demonstrate that exceptional circumstances exist. *See In re Advanced Marketing Services, Inc.*, 2008 WL 5680878 (D. Del. Apr. 3, 2008). "Interlocutory appeal is meant to be used sparingly and only in exceptional cases where the interests cutting in favor of immediate appeal overcome the presumption against piecemeal litigation." *AE Liquidation*, 451 B.R. at 349 (internal quotation marks omitted).

Defendants fail to present exceptional circumstances justifying the need for immediate review. YPF argues that the Interlocutory Order "disregards well-established law in a case that seeks recovery against foreign-owned entities for up to $14 billion of environmental harm that they indisputably did not cause," that the Opinion was decided "without clear reasoning," and that the "unprecedented ruling has enormous consequences for a foreign government." (*See* YPF Mot. at 16). Repsol argues that "the Bankruptcy Court's failure to eliminate meritless claims is an obstacle to meaningful settlement negotiations." Repsol argues that if the Opinion and Interlocutory Order are "[l]eft unrefined," then "productive settlement discussions and a termination of the litigation are unlikely." (Repsol Mot. at 16-17). That the quantum and relative shares of Defendants' liability remain open questions does not, according to the Trust, constitute an adequate justification to grant the extraordinary remedy of an interlocutory appeal.

Here, the Trust argues, all of the parties to the litigation are sophisticated parties fully capable of assessing the strengths and weaknesses of their legal positions and factoring them into settlement discussions, regardless of whether the Court allows an immediate appeal. (D.I. 7 at 20).

The Court agrees with the Trust. The potential to facilitate settlement is not a controlling contention for § 1292(b) certification. *See Piazza v. Major League Baseball*, 836 F. Supp. 269, 272 n.7 (E.D. Pa. 1993). Even assuming the litigation ultimately has enormous consequences for a foreign government, the Court finds no lack of clear reasoning in the Bankruptcy Court's Opinion. In sum, the Court does not find any "circumstance or reason that distinguishes this case from the procedural norm and establishes the need for immediate review." *In re Magic Rests., Inc.*, 202 B.R. 24, 26-27 (D. Del. 1996).

## IV.  CONCLUSION

For the reasons explained above, Defendants have not met the factors of § 1292(b), and the Court will deny the Motions for Leave to Appeal the Interlocutory Order. A separate order shall be entered.